FILED
JUL - 6 2009
ROBERT T. BRAITHWAITE
U.S. MAGISTRATE

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| UNITED STATES OF AMERICA<br>Plaintiff,<br><br>v.<br><br>MATTHEW SCOTT SIMPSON<br>Defendant. | REPORT AND RECOMMENDATIONS<br><br>2:08-CR-00733-TS |
|---|---|

Before the court is a Motion to Suppress submitted by Defendant, Matthew Scott Simpson. (File Entry #25.) After thorough review and consideration of the testimony and evidence presented at the evidentiary hearing and the parties' pleadings (neither party sought oral argument), the court recommends that Defendant's Motion to Suppress be DENIED.

## FACTUAL BACKGROUND

Agent Brian Redd of the Utah Department of Public Safety possesses wide law-enforcement experience. Over the course of nine years he has spent time in both investigation and patrol--including performing over 5,000 traffic stops with hundreds of those involving drugs. (Tr. 5-9.) He has participated in significant drug training. (Tr. 7-8.)

On November 16th, 2007, agent Redd patrolled I-15 in the St. George area. While doing so, he received a call from a fellow Trooper, Charlie Taylor. Trooper Taylor explained he saw a Chrysler 300 abruptly leave I-15 at Exit #4 and it caused him concern. (Tr. 9-10.) Troopers patrolling I-15 frequently respond to traffic incidents caused by fatigue, telephone use, eating, or

impairment. (Tr. 10-12.) An abrupt exit signals the possibility of such problems. (Tr. 9-12.)

In response to Trooper Taylor's call, agent Redd also left I-15 at Exit #4 and observed the Chrysler 300 leave its lane and cross a fog line. (Tr. 13.) No evidence exists suggesting a reason for the Chrysler 300 to veer out of its lane--that is, the weather was fine and the road clear. (Tr. 13-16.) Accordingly, agent Redd stopped the vehicle for both a legal violation and for safety concerns. (Tr. 16.)

Upon approaching the vehicle, agent Redd observed the driver to be a young female and the passenger an older male. (Tr. 17.) As it turns out, the driver, Aspen Stoddard, was twenty years old and the passenger, Matthew Simpson, was forty-seven. (Tr. 17-19.) The two are not related. (Tr. 18.) Agent Redd noticed nervousness in both Stoddard and Simpson; but what really struck the agent was the unusual degree and non-dissipating nervousness in Simpson, a passenger. (Tr. 19-20, 21, 26-28, 46-47, 56-57.) The car's occupants displayed this nervousness with trembling hands, facial expressions, and the like. *Id.*

Also of note to the agent, Simpson led the conversation and did so in an "overly engag[ing]" manner. (Tr.20-21.) For example, Simpson quickly (and of his own volition) declared that the car belonged to his uncle--a retired FBI agent. (Tr. 21-24.) Simpson also volunteered unusual details of his trip with Stoddard--such as buying lotto tickets at a location far distant from closer locations. (Tr. 25.)

As part of this initial encounter, Stoddard produced a driver license, (Tr. 34), and Simpson rifled through the glove-box for the car's registration. While doing so, Simpson exposed an envelope containing two syringes and needles--at least one of which appeared used.

(Tr. 31-32.) Simpson quickly professed the syringes belonged to his diabetic uncle. (Tr. 33-34.) No diabetic kit or other equipment accompanied the syringes. *Id.* When found, the car's registration showed the owner to be Simpson's uncle, Greg Adair.

After receiving Stoddard's driver license, the car's registration, and the syringes, agent Redd returned to his patrol car and began performing routine checks. (Tr. 35-38.) During this routine process, agent Redd learned that Simpson had a criminal history that included drug-distribution charges. (Tr. 37.) Agent Redd also learned of a "weapons alert" associated with Simpson. (Tr. 37-38.) This created obvious safety concerns in agent Redd. (Tr. 37.) By this time, other Troopers had arrived to assist the agent. (Tr. 38.) Based upon the obvious safety concerns, Trooper Taylor performed a safety sweep by "patting down" Simpson and taking a cursory look in the Chrysler. (Tr. 38-40.) While doing so, Trooper Taylor found a police scanner and a handcuff key in the car. *Id.*

During the time agent Redd conducted his routine checks, (Tr. 41), he and the other Troopers found occasion to talk to the Chrysler's two occupants. (Tr. 40-48.) Stoddard claimed she had known Simpson for three or four months and that Simpson employed her to work on vehicles in Cane Beds. (Tr. 40-42.) Moreover, Stoddard consented to a search of her purse. (Tr. 43-44.) That search exposed a mirror with scratch marks on it consistent with drug use. *Id.*

Also during the time agent Redd conducted his routine checks, (Tr. 44, 60), he talked with Simpson, (Tr. 44-48), for two or three minutes. (Tr. 61.) Like Stoddard, Simpson claimed the two had known each other for three or four months and that he employed her to work on cars. (Tr. 44-48.) During this same conversation, agent Redd obtained from Simpson a telephone

number to contact the car's owner, Adair. (Tr. 47-48.) The number belonged to Simpson's mother because Adair (her neighbor) possessed no telephone. (Tr. 48.) Simpson denied consent to search the car explaining that the car belonged to Adair. (Tr. 51-52.)

At about the time Simpson denied consent to search the car, Agent Redd finished his routine checks. (Tr. 44, 60.) He felt compelled, however, to confirm or dispel suspicions that had developed in his mind. He also felt compelled to determine whether Adair was, in fact, diabetic and whether he had granted permission to Simpson to use his car. (Tr. 48-50.) Accordingly, he called Simpson's mother. She arranged for Adair to call agent Redd back. (Tr. 48.) Adair confirmed his diabetic condition and explained that he granted Simpson permission to use his car. *Id.* Adair also expressed concern for what officers might find in his car and worried it might reflect poorly upon him. (Tr. 50, 77.) More crucially, agent Redd asked Adair for permission to search his car. (Tr. 49.) Agent Redd, testified that Adair gave "very clear" consent. Adair testified at the hearing that he did not give consent to search the vehicle, (Tr. 72.), but that he did not deny Redd permission to search his car (Tr.78).

The Troopers then searched Adair's car. (Tr. 52-53.) Inside they found a marijuana seed and methamphetamine. *Id.* Upon finding drugs, the Troopers arrested both Stoddard and Simpson. (Tr. 53.) While searching Simpson incident to arrest, the Troopers discovered four bundles of methamphetamine secreted in Simpson's pants. *Id.* The Troopers also discovered another bundle of methamphetamine where Simpson stood during the encounter. (Tr. 54.) The government charged Simpson with only the drugs in his pants.

## PROCEDURAL HISTORY

An indictment was filed on October 29, 2008. (File Entry #3.) On January 8, 2009, Defendant filed his Motion to Suppress the evidence obtained during the stop and search. (File Entry #25.) The case was assigned to United States District Judge Ted Stewart, who referred the case to United States Magistrate Judge Robert T. Braithwaite, pursuant to 28 U.S.C. Sec. 636(b)(1)(B), on January 8, 2009. (File Entry #26.)

An evidentiary hearing on the Motion to Suppress was held on February 2, 2009. (File Entry #38.) Defendant then filed a memorandum in support of his Motion on March 31, 2009. (File Entry #39.) The Government filed its memorandum opposing the Motion to Suppress on April 22, 2009. (File Entry #40.)

The parties submitted the Motion to Suppress on the pleadings and waived oral argument.

## ANALYSIS

Defendant seeks to suppress any evidence seized during the November 16, 2007 traffic stop. In addition to challenging the initial stop, Defendant argues that the arresting officer lacked legal authority to search Defendant's vehicle absent a Search Warrant. As a result, Defendant argues that all evidence gained through the search of vehicle must be suppressed.

Defendant's brief raises three issues: (1) whether the Troopers were justified in performing a protective search; (2) whether probable cause existed to search Adair's car; and (3) whether agent Redd received consent to search Adair's car.

**I. The Troopers were Justified in Performing a Protective Search**

As acknowledged by both parties, the correct basis for a protective search is officer safety. Also, the Tenth Circuit Court of Appeals explained that "[r]easonable suspicion for a search is *a minimum level of objective justification* 'based on the totality of the circumstances, taking into account an officer's reasonable inferences based on training, experience, and common sense.'" *Archuleta v. Wagner*, 523 F.3d 1278, 1284 (10th Cir. 2008)(quoting *United States v. Rice*, 483 F.3d 1079, 1083 (10th Cir. 2007)(emphasis added)). Moreover, "'[t]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent [person] in the circumstances would be warranted in the belief that [her] safety or that of others was in danger.'" *Id.* Furthermore, an officer need only possess "'a reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime.'" *United States v. Sanchez*, 519 F.3d 1208, 1216 (10th Cir. 2008)(quoting *Terry*, 392 U.S. at 27). Finally, cars' passengers present risks equal to drivers. *Sanchez*, 519 F.3d at 1215 (10th Cir. 2008).

**A. The Troopers Possessed Reasonable Suspicion Sufficient for a Protective Search**

By the time the officers decided to perform a protective sweep, they accumulated at least the following factors:

1. <u>Weapons alert</u>. Most critical to his assessment of possible danger, agent Redd learned that a "weapons alert" had been put in place for Simpson. A "weapons alert" is put in place specifically for officer safety. (Tr. 37.) That is, based upon interaction with Simpson, law-enforcement officials initiate a weapons alert specifically to warn fellow officers to take safety precautions when interacting with Simpson. (Tr. 37.) In the Court's view, a weapons alert from

one officer to another represents a "minimum level of objective justification"--especially since by law it relies on an *officer's* judgment. *Archuleta*, 523 F.3d at 1284.

    2. Prior conviction for a violent crime. Agent Redd learned by checking Simpson's criminal history that he had been convicted of a violent crime--robbery. In the Court's opinion, a "reasonably prudent person" would include such a history in the "totality of circumstances" leading to a reasonable suspicion of danger.

    3. Simpson's nervousness. Simpson was nervous--especially for a passenger--and that nervousness failed to dissipate over the course of the encounter as one might expect in a routine stop. (Tr. 19-20, 21, 26-28, 46-47, 56-57.) Nervousness appropriately factors into an officer's decision-making process.

    4. Simpson being "overly engaged." It remains undisputed that Simpson's aggressively led the conversation and did so as the car's passenger. Based upon his experience, agent Redd reasonably added this to the totality of circumstances suggesting crime and danger.

    5. Drug indicators. Simpson volunteered the car belonged to his uncle, (Tr 21-23); Stoddard displayed a marked deterioration in physical appearance in comparison to her driver license photograph, including sores on her face, (Tr.19, 28-31); and Simpson revealed syringes in the car's glove-box, (Tr. 31-32.) No evidence to the contrary exists. Agent Redd's training and experience suggested these factors indicated drug activity. (Tr. 19, 21-22, 28-32.) Case law recognizes the fact that "'[d]rug dealers often carry weapons to protect themselves and their large amounts of drugs and cash.'" *United States v. Luster*, 480 F.3d 551, 558 (7th Cir. 2007)(citing *United States v. Cantero*, 995 F.2d 1407, 1412 (7th Cir. 1993). While a belief that an individual

is involved in the world of illegal drugs does not alone justify a protective search, *see e.g.*, *United States v. Barrera-Martinez*, 274 F.Supp.2d 950, 963-64 (N.D. Ill. 2003), it represents a factor fairly added to the totality of circumstances indicating danger--especially in the instant case where Simpson's criminal history declared him to have been involved in both drugs and violent crime.

      6. <u>Odd details offered by defendant</u>. Throughout the course of the encounter (before the protective sweep) defendant proffered to agent Redd odd, unsolicited details about his trip and his life. For example, Simpson suggested he and Stoddard purchased lotto tickets relatively far from home, and that his uncle was a retired FBI agent living in Cane Beds. Again, while such details do not of themselves suggest danger, they do reasonably suggest to an experienced officer that defendant was attempting to hide something, dispel suspicions, or ingratiate himself and can be added to the totality of circumstances.

      In the Court's view, no legitimate question exists as to the appropriateness of a protective sweep. As explained, the government need only show a "minimum level of objective justification." *Archuleta*, 523 F.3d at 1284. The weapons alert alone reasonably piqued safety concerns. Agent Redd, however, reasonably added Simpson's history of violent crime and additional other factors to his decision to frisk Simpson. The relatively non-invasive protective sweep was justified.

### B. Reasonable Suspicion Unnecessary

      Even if the Court were to determine the Troopers possessed no concern about safety reasonably leading to a protective search, it would not affect the final outcome of the case. In the

second section of his Discussion, defendant argues that no probable cause exists to search the car (especially without the police scanner and handcuff key). (Def. Br. 8.) Agent Redd, however, did not rely on probable cause to search the car; nor does the government now rely on it. Agent Redd based his search upon Adair's consent (as will be presently addressed).

To the extent reasonable suspicion was needed--to extend the stop or ask for consent to search--the Court determines it existed without the police scanner or handcuff key. However, even assuming defendant were to convince the Court no reasonable suspicion existed, the outcome of the case would be the same--no suppression. That is, defendant cannot establish the required nexus between an illegal detention and the narcotics seized. *See, e.g., United States v. Nava-Ramirez*, 210 F.3d 1128, 1131 (10th Cir. 2000). Specifically, defendant has not shown that "the evidence sought to be suppressed would not have come to light but for the government's unconstitutional conduct." *Id.* There is no reason to assume that Agent Redd would not have asked Adair for consent to search the car absent the protective search. As in another Tenth Circuit case, "the [contraband] was not the fruit of the illegal detention." *United States v. Deluca*, 269 F.3d 1128, 1133-34 (10th Cir. 2001). Clear intervening factors (including Adair's consent to search as will be discussed) separate the protective sweep from the discovery of the methamphetamine. The purportedly illegal sweep is simply too attenuated from the drugs to warrant suppression.

## II. Probable Cause to Search Adair's Car is Irrelevant

Defendant argues in his second Discussion segment that "The Investigating Troopers Lacked Probable Cause for the Initial Search of the Vehicle." (Def. Br. 6.) Neither Agent Redd

nor the government relies upon probable cause for the protective search. Safety dictated that search. Similarly, Agent Redd based the post-telephone-call search not upon probable cause, but on consent. Hence, probable cause plays no role in the case.

### III. Agent Redd Received Consent to Search Adair's Car

This motion revolves around Adair's consent to search his car. That is, (1) whether Agent Redd appropriately asked for consent; (2) whether Adair possessed the authority to consent; and (3) whether Adair did, in fact, consent.

#### A. Agent Redd appropriately asked for consent

Though not specifically challenged by defendant, the Court briefly notes Agent Redd's appropriateness in detaining the car's occupants for additional investigation--including whether or not Adair would consent to a search of his car.

The law clearly establishes that a police officer may detain someone for additional questioning unrelated to the original stop, if the officer has an objectively reasonable and articulable suspicion of illegal activity. *See e.g.*, *United States v. Soto*, 988 F.2d 1548, 1554 (10th Cir. 1993); *c.f. United States v. Walker*, 933 F.2d 812, 817 (10th Cir. 1991). In assessing whether Agent Redd could have formed a reasonable and articulable suspicion of criminal activity, the Court must base decisions not on any one factor, but on the "totality of the circumstances." *United States v. Jones*, 44 F.3d 860, 872 (10th Cir. 1995). In assessing reasonable suspicion, courts must also defer to trained law enforcement personnel and their "ability to distinguish between innocent and suspicious circumstances." *United States v. Mendez*, 118 F.3d 1426, 1431 (10th Cir. 1997).

> The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as fact-finders are permitted to do the same–and so are law enforcement officers. . . . [T]he evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement. Trained officers aware of the modes and patterns of operation of certain kinds of lawbreakers can draw inferences and make deductions that might well elude untrained persons.

*Id.* (citing *United States v. Cortez*, 449 U.S. 411, 418 (1981)). In assessing reasonable suspicion, an officer is allowed "to draw on [his] own experience and specialized training to make inferences from and deductions about the cumulative information available to [him] that might well elude an untrained person." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). "The evaluation is made from the perspective of the reasonable *officer,* not the reasonable *person.*" *United States v. Quintana-Garcia*, 343 F.3d 1266, 1270 (10th Cir. 2003)(emphasis in original). An officer is at liberty to spend the time necessary (although no more than necessary) to confirm or dispel his suspicions. *United States v. Kopp*, 45 F.3d 1450, 1454, n.1 (10th Cir. 1995)(citation omitted).

By the time he asked Adair for consent, Agent Redd accumulated at least the following factors contributing to his suspicion:

1. Factors 1-6 listed in Analysis I.A. These factors remained with Agent Redd throughout the course of the encounter.

7. Police Scanner. While performing a protective sweep, the Troopers found a police scanner inside the car. Agent Redd reasonably believed that criminals attempt to monitor police officers with such scanners and it is indicative of criminal activity. (Tr. 38-40.)

8. <u>Handcuff key</u>. Also during the protective sweep, the Troopers found a handcuff key. To the Court, the potential of a handcuff key to help criminals escape appears obvious and its possession unusual. (Tr. 38-40.)

9. <u>Scratched mirror</u>. Based upon Stoddard's consent, the Troopers found a mirror in her purse with scratch marks on it. Agent Redd suggested such marks indicate drug use. (Tr. 43-44.) The Court agrees.

No question exists as to the appropriateness of Agent Redd asking for consent to search. Defendant raises no issue and its appropriateness is clear.

**B. Adair Possessed the Authority to Consent**

Consensual searches are one of the recognized exceptions to the warrant requirement. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973); *United Staets v. Kimoana*, 383 F.3d 1215, 1221 (10th Cir. 2004). Government agents may obtain consent to search from a person whose property is searched or a third party who has either actual or apparent authority to consent to a search. *United States v. Matlock*, 415 U.S. 164, 171 (1974); *United States v. Rith*, 164 F.3d 1323, 1329 (10th Cir. 1999)(discussing actual authority); *Illinois v. Rodriquez*, 497 U.S. 177, 186-188 (1990)(discussing apparent authority); *Kimoana*, 383 F.3d at 1221 (discussing both types of authority). Adair possessed both actual and apparent authority to consent to the search of his vehicle.

1. <u>Actual Authority</u>. In order to determine if a person has actual authority to consent to a search, the government must show by a preponderance of the evidence that the third party has either "(1) mutual use of the property by virtue of joint access, or (2) control for most purposes

over it." *Rith*, 164 F.3d at 1328-1329.[1] Defendant provides no authority to the contrary. That is, there is nothing to suggest that the existence of a rental relationship, however informal, prevents someone with joint access or control from consenting to a search.

Adair possessed "joint access" to his car. In his testimony, Adair explained that he could use the car when "he happened to need it." (Tr. 66, 74.) He further stated that the arrangement between Simpson and him allowed Simpson to use the vehicle for thirty non-consecutive days--the only other temporal limitation being that Adair did not want to "drag this out for six months." (Tr. 66.) So, even a conservative estimate of how long the arrangement may have lasted--say, two or three months--would have left Adair in actual possession of the car as often or more often than Simpson.

As to "control for most purposes," it remains undisputed that such lay with Adair. Adair owned the car, (Tr. 73, 21-22); it was registered in his name, (Tr. 35-36); he dictated the conditions of the car's use, (Tr. 67); and he possessed the ability (and confidence) to store important items in the car--such as syringes, (Tr. 31-32, 68.) Other less obvious factors also suggest control. For example, he never professed inability to consent to a search; he expressed concern for the condition of the car, (Tr. 76); he acknowledged Agent Redd agreed to call him back from the traffic-stop's scene suggesting more control than Simpson, (Tr. 51); he planned to retrieve the car from the site of the traffic stop, (Tr. 79); and he provided personal identifiers to Agent Redd, (Tr. 50), evincing ownership and decision-making ability. Superior rights

---

[1] *Rith* and many other cases dealing with authority deal with a residence. Certainly if the government proves authority by a preponderance according to the rules of a residence--which it has--it will also have proved authority as to a vehicle which carries a lesser expectation of privacy.

(undoubtedly Adair's) prevail. *United States v. Anderson*, 399 F.2d 753, 756-57 (10th Cir. 1968). The video corroborates Adair's ownership and control.

    2. <u>Apparent Authority</u>. No Fourth Amendment violation exists if "officers enter without a warrant when they reasonably, although erroneously, believe that the person who consents to their entry has the authority to consent to this entry. *United States v. Gutierrez-Hermosillo*, 142 F.3d 1225, 1230 (10th Cir. 1998). The test is an objective evaluation of whether "the facts available to the officer at the moment . . . warrant a man of reasonable caution [to believe] that the consenting party had authority over the premises?" *Id.* Similar to actual authority, "a third party has apparent authority if the officer has a reasonable belief that the third party has "'(1) mutual use of the property by virtue of joint access, or (2) control for most purposes over it.'" *United States v. Cos*, 498 F.3d 1115, 1128 (10th Cir. 2007)(quoting *Rith*, 164 F.3d at 1329). The factors listed under the Actual Authority section apply equally here; Agent Redd learned of them during the stop giving at least the appearance of authority. One can add to the list, however, that Simpson suggested the vehicle belonged to his uncle so he (Simpson) could not give permission to search it. (Tr. 22-24, 51-52,58-61.) Someone possessed authority; to all reasonable appearances it was Adair.

### C. Adair Consented

The Tenth Circuit Court of Appeals determined that "[t]he scope of consent is a fact question based upon what a reasonable person would have understood under the circumstances." *United States v. Gregoire*, 425 F.3d 872, 880 (10th Cir. 2005); *see also, United States v. Pikyavit*, 527 F.3d 1126, 1130 (10th Cir. 2008). Once again, the burden on the government is to

show consent by a *preponderance of the evidence*. *Rith*, 164 F.3d at 1328 (emphasis added); *United States v. Romero*, 27 Fed.Appx.995, 2007 WL 2694242 (10th Cir. 2007)(unpublished).

Importantly, this case involves no dispute about the clarity or voluntariness of consent. That is, the parties have not agreed to a set of facts surrounding consent (such as words spoken) leaving them to bicker about whether such facts legally amount to consent. Nor has any witness suggested gray area. Rather, there is a core factual dispute--one witness (Agent Redd) said unequivocal consent existed; one witness (Greg Adair) said no consent existed.

Of particular importance to this case is the Tenth Circuit's declaration that "'the credibility of the witnesses and the weight to be given the evidence, together with inferences, deductions and conclusions to be drawn from the evidence, are all matters' most appropriate for resolution by the district court." *United States v. Guerrero*, 472 F.3d 784, 789 (10th Cir. 2007)(quoting *United States v. Walker*, 933 F.2d 812, 815 (10th Cir. 1991). Moreover, such a credibility analysis by the Court "holds 'particularly true where, as here, the credibility of witnesses is important . . . .'" *Id.* (quoting *United States v. Guzman*, 864 F.2d 1512, 1521 (10th Cir. 1988).

The Court finds Agent Redd more credible than Greg Adair.

1. <u>Agent Redd's credibility</u>. Agent Redd possesses impressive experience. (Tr. 6-9.) He testified that Adair's consent to search the car was "very clear." (Tr. 51.) He also responded affirmatively when asked whether the permission to search was "clear and obvious." (Tr. 51.) No reason exists to doubt him. Furthermore, Agent Redd memorialized events in a then-current

police report. (Tr. 55-56.) Critically important, also, is that Agent Redd's testimony comports with the video evidence.

If one were to disbelieve Agent Redd, one would also have to believe that Agent Redd put his career at risk, spontaneously orchestrated events (on video) well enough to look credible, performed one side of telephone conversations without regard to the other side, and did all things in a manner that would withstand later scrutiny. The Court does not believe such a scenario occurred.

2. Greg Adair's credibility. Adair's testimony was less than persuasive. For example, Adair obviously lacked a clear memory. He acknowledged he could only "pretty much" remember the events of November 16th, 2007. (Tr. 64.) Because of this, his testimony is filled with words of doubt--for example, "probably," (Tr. 64, 69), "I don't know," (Tr. 64, 69), and "not sure." (Tr. 71.)

Adair's testimony also contains qualifiers eviscerating certainty. For example, when talking about whether he was concerned about what might be found in his car he said he "didn't care what was found in it *necessarily*." (Tr. 77.) Or, when asked about the length of his car "rental" relationship with Simpson, Adair said "I didn't really keep track." (Tr. 66.) This creates doubt in both Adair's memory and the existence of property rights delegated to Simpson. Furthermore, the transcript contains a number of other examples showing generally unresponsive or evasive answers. (Tr. 65-71, 76-78.)

Other examples within Adair's testimony display either poor memory or dissembling. For instance, Adair suggested that Agent Redd told him that he (Agent Redd) pulled-over

Simpson and Stoddard because of a "cracked windshield." (Tr. 69.) No supporting evidence exists of either a cracked windshield or any discussion about a cracked windshield--including video evidence. Another example where Adair's testimony directly contradicts recorded video evidence occurs when Adair claimed Agent Redd laughed at him several times. (Tr. 70.) The video shows one friendly chuckle from Agent Redd. (DVD 21:45.) Adair also had trouble remembering whether the syringes belonged to him. (Tr. 68.) Finally, after the Agent informed Simpson that Adair consented, Simpson seemed to express disbelief. So, Agent Redd actually allowed Simpson to call Adair. Simpson and Adair talked. At no time during that conversation did a presumably desperate Simpson argue Agent Redd lied or misinterpreted anything. Nor did Simpson ask the Troopers to stop the search based upon his conversation with Adair. (DVD 21:49 - 22:02.) Simpson, himself, seemed to corroborate the existence of consent.

Adair's testimony additionally contains significant internal inconsistencies--that is, two or more statements which cannot all be true. To illustrate, the record shows that Adair (1) claimed he cared not what officers found in his car, (Tr. 77); but he also (2) said what officers found in his car caused him concern. (Tr. 50, 77.) Likewise, Adair claimed (1) that while talking on the telephone to Agent Redd he "just felt like [Agent Redd] had already searched [the car];" but he also claimed (2) that he knew Agent Redd was calling to ask for consent to search, (Tr. 77), that he was worried about what would happen to his car if searched, (Tr. 70), and that he suggested Agent Redd get a warrant before searching, (Tr. 78-79.) Adair admitted he knew Agent Redd called him to ask for consent to search his car, (Tr. 77); he then, however, claimed that he gave Officer Redd no answer--that is, he neither consented nor denied consent. (Tr. 77.) Hence, in

order to find for defendant, the Court would have to not only find Adair credible (or more credible than Agent Redd), it would necessarily need to parse Adair's testimony (and Agent Redd's testimony) into believable and non-believable sections.  Alternatively, Agent Redd's testimony remains consistent throughout and can be believed (or disbelieved) in whole.

Agent Redd told Adair that because he "cooperated" the Agent would not impound the car. (DVD 21:50 - 22:02.) Consenting to the search represents the only conceivable "cooperation." The video clearly corroborates Agent Redd.  For example, it shows him calmly noting Adair gave him consent several times. (*see e.g.*, DVD 21:30 - 21:50.) And, importantly, Agent Redd actually describes to another Trooper that Adair consented while waiting on an open telephone line to the location Adair received calls. (DVD 21:30.) The Court finds Agent Redd credible and finds Adair less credible than Agent Redd.  Hence, the government has shown consent by a preponderance of the evidence.  Thus, the court recommends that Defendant's motion to suppress be DENIED.

## RECOMMENDATION

Based on the foregoing analysis, **IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress evidence seized during the search of Defendant's vehicle ( File Entry # 25) be DENIED.

Copies of the foregoing report and recommendation are being mailed to the parties who are hereby noticed of their right to object to the same.  The parties are further notified that they must file any objections to the report and recommendation, with the clerk of the district court, pursuant to 28 U.S.C. Section 636(b), within ten (10) days after receiving it.  Failure to file

objections to both factual and legal findings may constitute a waiver of those objections on subsequent appellant review.

DATED this 6 day of July of 2009.

BY THE COURT:

ROBERT T. BRAITHWAITE
U.S. Magistrate Judge